RENDERED: APRIL 17, 2026; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2024-CA-1454-MR

GREG CASEY                                            APPELLANT

                APPEAL FROM FAYETTE CIRCUIT COURT
v.              HONORABLE LUCY ANNE VANMETER, JUDGE
                 ACTION NO. 19-CR-00558

COMMONWEALTH OF KENTUCKY                      APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE: EASTON, KAREM, AND TAYLOR, JUDGES.

KAREM, JUDGE: Greg Casey appeals from the Fayette Circuit Court's judgment convicting him of two (2) counts of second-degree arson, two (2) counts of third-degree burglary, and one (1) count of theft by deception, $10,000 or more but under $1,000,000, and sentencing him to fifteen (15) years' imprisonment and the repayment of $108,260 in restitution. Finding no error, we affirm.

# FACTUAL AND PROCEDURAL BACKGROUND

This case involves two (2) separate fires that occurred on December 26, 2018, and February 7, 2019, at an office building in Lexington, Kentucky. Curt Collins ("Collins") was the owner of the building, which was comprised of a front and back building connected by a small corridor. The front section of the building was an office for Collins's company, Collins Fire Protection, and the back section was rented to Eric Higgins, who owned H&H Racing ("H&H"). At H&H, Higgins serviced and repaired motorcycles.

Higgins knew Greg Casey ("Casey") from racing motorcycles, and Higgins had attempted to repair one of Casey's damaged motorcycles at H&H. Casey was dissatisfied with the repairs that Higgins had performed and ultimately demanded the return of his motorcycle. Although Higgins returned the motorcycle and parts, Casey felt that Higgins had cheated him by not fully performing the repairs to Casey's satisfaction or returning Casey's money.

The two fires that occurred in December 2018 and February 2019 were concentrated only in the part of the building rented to H&H; there was no damage to the front part of the building where Collins Fire Protection was located. Moreover, the police determined that the fires were intentionally started. Casey was ultimately arrested and charged in connection with both fires. Police also found stolen motorcycle parts from H&H in Casey's possession.

After a trial in May 2024, the jury found Casey guilty of two (2) counts of second-degree arson, two (2) counts of third-degree burglary, and one (1) count of theft by deception, $10,000 or more but under $1,000,000, and recommended a total sentence of fifteen (15) years' imprisonment. The Fayette Circuit Court sentenced Casey accordingly. Moreover, based on the evidence provided at a restitution hearing, the circuit court ordered Casey to pay $108,260 in restitution to Higgins. This appeal followed.

We will discuss additional facts as they become relevant.

## ANALYSIS

Casey first argues that he was denied a fair trial by the circuit court's allowance of the Commonwealth's evidence of GPS location data from Casey's cell phone obtained through Cellebrite technology. Specifically, Casey's defense team argued that the Commonwealth was required to establish the reliability of the GPS coordinates found in the Cellebrite report before it could be offered into evidence. Casey properly preserved this issue through his motion *in limine*, and we review its admission for an abuse of discretion, whereby we examine "whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999) (citations omitted).

Here, four phones were seized during the execution of several search warrants in February 2019. Special Agent Michael Oergel from the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("Agent Oergel") used a technology called Cellebrite to extract data from the phones into readable reports that were then provided to the investigators involved in this case.

Casey filed a motion *in limine* on April 24, 2024, requesting that the circuit court "exclude [C]ellebrite software GPS cell phone location/coordinates search results of [Casey's] cell phone." In its response to the motion *in limine*, the Commonwealth indicated that it was not seeking to use Agent Oergel as an expert witness; rather, it was intending to introduce through Agent Oergel that he received the phones, hooked them up to the Cellebrite program, and received the resulting data, which he then provided to the investigators. The circuit court heard the motion the morning of trial and, after arguments, denied the motion *in limine* to exclude the Cellebrite data.

The Kentucky Supreme Court has recently explained the Cellebrite software as follows:

> Cellebrite is a for profit, digital forensics company that specializes in the creation and manufacturing of programs that can perform forensic extractions on digital devices. Members of law enforcement are not privy to how Cellebrite's proprietary technology works, but they can be trained to use it. Cellebrite's extraction equipment allows law enforcement to perform an extraction of all the data that exists on a device. In

essence it creates a "clone" of all the information on a particular device and uploads it to a computer; all an officer must do is plug the device into the forensic equipment and run the program. However, the data that is thereby extracted is not in a form that is capable of being read or understood by the average person. Officers must use a different Cellebrite program called Physical Analyzer to "translate" all the raw data extracted from the phone into an intelligible format. One of the officers who testified in this case . . . stated that unless an individual had an "extreme knowledge of computers and programing" they would be unable to look at the raw data from an extraction and know what it contained before translating it with the second Cellebrite program, Physical Analyzer.

*Baldwin v. Commonwealth*, 723 S.W.3d 676, 686–87 (Ky. 2025).

In this case, we find the 5th Circuit case *United States v. Williams* to be helpful. 83 F.4th 994 (5th Cir. 2023). After Williams's arrest, the police used a Cellebrite device to copy the information from his and his alleged victim's mobile phone by plugging them in and running the Cellebrite program. *Id*. at 995. As the Court explained, "[t]he program pulled out the user data—including any messages, videos, or emails sent, received, or recently deleted—along with the apps used on the phone, and provided it to the police in an accessible, easily-navigable, and readable format." *Id*. In his motion *in limine*, which the trial court ultimately denied, Williams objected to the use of the Cellebrite testimony without an expert witness to introduce and explain such testimony and a finding of reliability. *Id*. at

995–96.  Williams renewed his objection at trial, which the trial court overruled.

*Id*. at 996.

On appeal, Williams claimed that the trial court committed reversible error when it admitted the Cellebrite testimony without an expert witness and a finding of reliability.  *Id*.  However, the 5th Circuit stated the following in response to Williams's argument:

> We find no error, much less an abuse of discretion. Williams claims that Cellebrite is a complex technology, *ergo*, the operation of Cellebrite requires specialized knowledge, and the introduction of a Cellebrite report demands qualification of a witness as an expert.  But this ignores the basic realities of life.  All the officer did was run a computer program.  He offered no technical understanding of the machine or software; he did not write the program; and he did not opine on any application of specialized knowledge.
>
> During trial, the investigator explained that "[a]s an operator, I purely operate the machine.  I am not privy to the programming or how it extracts data."  Thus, he explicitly disclaimed that he was offering expert testimony.  This is the antithesis of Rule 702's requirement of "scientific, technical, or other specialized knowledge."  Fed. R. Evid. 702(a).  Rather, the investigator knew no more than anyone else who runs a program on his computer that he did not write.
>
> Every circuit that has addressed this question— whether evidence obtained with Cellebrite technology requires expert testimony for admission—has answered it in the negative.  In *United States v. Chavez-Lopez*, the Fourth Circuit concluded that the sponsoring witness offered only fact testimony, such as "the actions he took to extract the data—hooking the phones up to a

-6-

computer, following a few prompts, and saving data onto an external drive." 767 F. App'x 431, 434 (4th Cir. 2019). "At most, [the witness] offered the opinion that Cellbrite copies data from a cellphone, which he derived from his personal experience using the software." *Id.* That testimony "didn't require a technical understanding of Cellebrite, and he made no claims about the program's effectiveness or reliability." *Id.*

*Id.* at 996–97. Thus, the 5th Circuit determined that the trial court properly ruled that Federal Rule of Evidence 701 was applicable, which governs lay witness testimony, and no error had occurred.

We find the same outcome to be applicable in this case. Similarly to *Williams*, Agent Oergel testified to how he downloaded the information from the phones using Cellebrite technology and received a report of data after the Cellebrite software "parsed" it into a legible format. The results were easily understandable by the common person and required no specialized knowledge or skill to decipher. At no point did he speak to the reliability of the software or vouch for the accuracy or reliability of Cellebrite's software. To that end, he did not discuss any information that was beyond the knowledge of an average cell phone user. As stated in *Williams*,

> [w]ithout a showing of specialized knowledge, the mere use and understanding of a Cellebrite extract at trial is insufficient to require an expert. Operating a Cellebrite device and understanding its report require knowledge in the realm of a reasonably tech-savvy lay person, regardless of the investigator's testimony that he was a "certified" operator and analyzer.

-7-

*Id.* at 998 (footnote omitted).  Thus, Agent Oergel's testimony did not run afoul of the requirements of Kentucky Rule of Evidence ("KRE") 702 because it was in line with KRE 701's requirements.

Nor do we find—as Casey argues—that the information contained in the Cellebrite report, which contained GPS coordinates directly from Casey's cellphone, to be analogous to GPS coordinates provided by AT&T via its Network Event Location System ("NELOS").  The reasoning provided by Casey during an earlier *Daubert*[1] hearing for this information focused on the unknown sources of data collected by AT&T's algorithm that provided the resulting location data.  In contrast, the source of the location data contained within the Cellebrite report is known, as it came directly from Casey's phone.  These locations and data points were native to the phone and did not come from an unknown number of unnamed sources that an algorithm then secretly translated into coordinates, as occurs with AT&T's NELOS data.  Therefore, we affirm as to this issue.

Casey next contends that the Commonwealth failed to present sufficient evidence that Casey was guilty of theft by unlawful taking over $10,000. He requests palpable error review, as he failed to preserve this issue.

> Under [Kentucky Rule of Criminal Procedure
> ("RCr")] 10.26, an unpreserved error may be reviewed
> on appeal if the error is "palpable" and "affects the

---

[1] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

substantial rights of a party." Even then, relief is appropriate only "upon a determination that manifest injustice has resulted from the error." An error is "palpable," only if it is clear or plain under current law. Generally, a palpable error "affects the substantial rights of a party" only if "it is more likely than ordinary error to have affected the judgment." We note that an unpreserved error that is both palpable and prejudicial, still does not justify relief unless the reviewing court further determines that it has resulted in a manifest injustice; in other words, unless the error so seriously affected the fairness, integrity, or public reputation of the proceeding as to be "shocking or jurisprudentially intolerable."

*Miller v. Commonwealth*, 283 S.W.3d 690, 695 (Ky. 2009) (citations omitted).

As previously discussed, Casey argues that the Commonwealth failed to present sufficient evidence that he was guilty of theft by unlawful taking over $10,000. Our Supreme Court has discussed the issue of "sufficient evidence" in the context of the directed verdict rule as follows:

> On motion for directed verdict, the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony.

-9-

On appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal.

*Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991) (citations omitted).

In this case, Casey had in his possession property that was stolen from H&H. Moreover, Casey had taken photos of other stolen items that were no longer in his possession. Higgins was able to identify such items as either his or belonging to Higgins's customers. Regarding the value of the items stolen, Higgins testified as to the individual values of the items, which totaled $10,350. Moreover, Casey himself told someone on Facebook Messenger eight days after the first fire and burglary incident that he probably had "around $10,000 worth of stuff." The foregoing evidence meets the *Benham* standard as set forth by the Kentucky Supreme Court, and we can discern no manifest injustice or palpable error.

Casey's final argument is that the circuit court erred when it awarded $108,260 in restitution to Higgins. Under Kentucky Revised Statute ("KRS") 532.032(1), "[r]estitution to a named victim . . . shall be ordered in a manner consistent . . . with the provisions of this section[.]" Further, under KRS 532.350(1)(a), "[r]estitution" is defined as "any form of compensation paid by a convicted person to a victim for counseling, medical expenses, lost wages due to injury, or property damage and other expenses suffered by a victim because of a

-10-

criminal act[.]"  The Kentucky Supreme Court has stated that in order to establish a

valid restitution order:

> constitutional due process requires an adversarial hearing
> that includes the following protections:
>
> > • reasonable notice to the defendant in advance of the
> > sentencing hearing of the amount of restitution
> > claimed and of the nature of the expenses for which
> > restitution is claimed; and
> >
> > • a hearing before a disinterested and impartial judge
> > that includes a reasonable opportunity for the
> > defendant, with assistance of counsel, to examine the
> > evidence or other information presented in support of
> > an order of restitution; and
> >
> > • a reasonable opportunity for the defendant with
> > assistance of counsel to present evidence or other
> > information to rebut the claim of restitution and the
> > amount thereof; and
> >
> > • the burden shall be upon the Commonwealth to
> > establish the validity of the claim for restitution and
> > the amount of restitution by a preponderance of the
> > evidence, **and findings with regard to the
> > imposition of restitution must be supported by
> > substantial evidence**.

*Jones v. Commonwealth*, 382 S.W.3d 22, 32 (Ky. 2011) (emphasis added).

"Substantial evidence is evidence which, when taken alone or in light of all the

evidence, has sufficient probative value to induce conviction in the mind of a

reasonable person."  *Donovan v. Commonwealth*, 376 S.W.3d 628, 631 (Ky. App.

-11-

2012) (citation omitted).  Further, "KRS Chapter 532 places the issue of restitution solely within the discretion of the trial court."  *Id.*

In this case, substantial evidence supported the circuit court's order. The circuit court held a restitution hearing on August 20, 2024, at which Higgins testified and was cross-examined.  Further, the circuit court entered a comprehensive restitution order outlining the evidence upon which it relied, including photographic evidence, a prepared list of the items with their approximate values, and Higgins's uncontroverted testimony.

Because much of Higgins's documentation was destroyed in the fire, the circuit court's decision to allow Higgins to testify about the items and their respective values was not an abuse of discretion.  Indeed, "witnesses familiar with personal property may testify as to its value, even though they are not experts upon the subject."  *Svea Fire & Life Ins. Co. v. Walker*, 56 S.W.2d 967, 967 (Ky. 1932) (citations omitted).  Further, a panel of this Court has stated:

> It is well established in this Commonwealth that a properly qualified lay witness may render an opinion regarding the value of property.  To be so qualified, the lay witness must "know the property to be valued and the value of the property in the vicinity, must understand the standard of value, and must be possessed of the ability to make a reasonable inference."  It is well within the trial court's discretion to decide whether a lay witness is qualified to provide opinion evidence.  The witness's "lack of specialized training goes only to the weight, not to the competency, of the evidence."

*Summe v. Gronotte*, 357 S.W.3d 211, 213–14 (Ky. App. 2011) (citations omitted).

In this case, the circuit court had the opportunity to hear testimony from Higgins during the trial and the restitution hearing. The circuit court found that Higgins had "extensive knowledge regarding motorcycles and is more than competent to render an opinion as to the value of items damaged or destroyed by the fire." The circuit court also found him to be a "credible witness," as he had testified that he had been in his shop six to seven days a week for thirteen years and had "a clear understanding of the inventory and equipment present at the time of the loss." We find that the circuit court's restitution order was based on substantial evidence and that the circuit court did not abuse its discretion.

## **CONCLUSION**

For the foregoing reasons, we affirm the Fayette Circuit Court's judgment.


ALL CONCUR.


| BRIEF FOR APPELLANT: | BRIEF FOR APPELLEE: |
|---|---|
| Roy Alyette Durham II<br>Assistant Public Advocate<br>Frankfort, Kentucky | Russell Coleman<br>Attorney General of Kentucky |
| | James Havey<br>Assistant Solicitor General<br>Frankfort, Kentucky |